UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PHILIP CRANE

Plaintiff,

-vs-

DTE ELECTRIC COMPANY

Defendant.

Case No.

Hon.

Darcie R. Brault (P43864)
James D. Brokaw (P88547)
McKNIGHT, CANZANO, SMITH,
BRAULT & KING, P.C.
3950 W. Eleven Mile Rd.
Berkley, MI 48072
(248) 354-9650
dbrault@michworkerlaw.com
jbrokaw@michworkerlaw.com
*Attorneys for Plaintiff*

**COMPLAINT AND JURY DEMAND**

Plaintiff Philip Crane ("CRANE" or "Plaintiff"), by his attorneys, McKnight, Canzano, Smith, Brault & King, P.C., complains against Defendant DTE Electric Company ("DTE" or "Defendant") as follows:

**INTRODUCTION**

1. DTE retaliated against Plaintiff for refusing to acquiesce in safety data reporting practices that were non-compliant with nuclear industry standards, in

violation of the Energy Reorganization Act of 1974 ("ERA"), 42 U.S.C. § 5801 *et seq* and in violation of Michigan Public Policy.

**<u>JURISDICTION AND VENUE ALLEGATIONS</u>**

2. CRANE is an individual residing in Clare County, Michigan.

3. DTE is a Michigan corporation doing business throughout the State of Michigan, including within the Eastern District of Michigan, Southern Division.

4. DTE maintains its principal headquarters in Detroit, Michigan.

5. DTE is a licensee of the Nuclear Regulatory Commission ("NRC") and an employer under Section 211 of the ERA, 42 U.S.C. § 5851 ("Section 211).

6. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States; specifically, Section 211.

7. This Court has ancillary jurisdiction over CRANE's state law claim under 28 U.S.C. § 1367.

8. CRANE raised DTE's Section 211 violation in Claim No. 301056966, filed with the United States Department of Labor, Occupational Safety and Health Administration ("OSHA") on July 3, 2025, within 180 days after the violation as required under 42 U.S.C. § 5851(b)(1).

9. Over one year has passed since CRANE filed his OSHA complaint, giving this Court *de novo* jurisdiction over this action under 42 U.S.C. §

5851(b)(4).

10. CRANE has advised the Department of Labor Office of Administrative Law Judges of his intent to file this action. A copy of this complaint is served on that agency simultaneously with its filing in this Court.

11. Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391(b)(1) and (2).

## GENERAL ALLEGATIONS

12. Plaintiff, by reference, incorporates all preceding paragraphs as though fully set forth herein.

13. DTE operates a nuclear power generation facility known as the Fermi 2 Power Plant ("Fermi 2").

14. DTE operates Fermi 2 under the NRC's licensing authority and regulatory oversight.

15. Certain NRC quality assurance regulations, 10 C.F.R. § 50 App. B ("Appendix B"), require DTE to maintain a "quality assurance program" for Fermi 2.

16. The Fermi 2 quality assurance program is, explicitly, required by Appendix B.

19. Administration of the Fermi 2 quality assurance program constitutes an action to carry out the purposes of nuclear energy safety statutes within the

meaning of Section 211.

17. Pursuant to the quality assurance program, DTE's Nuclear Oversight Organization ("NOS") oversees the preventative maintenance program administered by the Outage and Work Management Department ("O&WM").

18. NOS also oversees O&WM reporting of work management and maintenance data to the Institute of Nuclear Power Operations ("INPO").

19. INPO is a third-party nuclear power facility auditing organization.

20. DTE is a member of INPO.

21. When NOS identifies a problem related to preventative maintenance, NOS documents the issue using a corrective action document/Condition Report ("CARD" or "CR"), thereby escalating the matter to the relevant departmental managers.

22. DTE's procedure for issuing and processing CARD/CRs is part of its quality assurance program, maintained in compliance with Appendix B.

23. DTE employed CRANE at Fermi 2 beginning on or about April 10, 1995.

24. CRANE obtained an NRC Reactor Operator license in 1997 and Senior Reactor license in 2006, which he maintained in active status until he transitioned to a Manager position which did not require an active license.

25. DTE uses time-limited job rotations for its exempt workforce.

26. Because of the rotational assignments, CRANE held a variety of positions with DTE during his career.

27. From approximately the summer of 2022 through February 2024, CRANE worked a rotational DTE assignment with INPO in Atlanta, Georgia.

28. CRANE returned to Fermi 2 in February of 2024.

29. DTE assigned CRANE a rotational assignment position in NOS.

30. DTE advised CRANE, in writing, that the NOS assignment would last two years.

31. In his new role, CRANE identified issues with O&WM's handling of certain maintenance data.

32. DTE's quality assurance program (informed by INPO and in conformance to Appendix B) sets standards for the scheduling and completion of certain preventative maintenance tasks within prescribed scheduling intervals.

33. Those standards include a grace period of an additional 25% of the original schedule interval for a given maintenance task.

34. A task is "Deep in Grace" if it has not been completed within the first half of that grace period.

35. O&WM provides INPO data about the number of maintenance tasks "Deep in Grace" at Fermi 2.

36. On or before August 9, 2024, INPO data reflected **three** tasks "Deep

in Grace."

37. Concurrently, CRANE identified internal station data reported as of July 31, 2024, reflecting **nineteen** tasks "Deep in Grace."

38. In other words, O&WM's reporting to INPO understated the number of tasks "Deep in Grace" and was therefore not compliant with applicable INPO standards, DTE/Fermi 2 standards, nuclear industry standards, and ethical reporting standards.

39. At biweekly meetings between departments beginning in July 2024, CRANE spoke to the head of O&WM, Randall Earley (hereinafter "EARLEY") and shared his findings.

40. EARLEY became angry, rejected CRANE'S assessment, and refused to modify how O&WM reported data to INPO.

41. CRANE escalated the issue anyway on August 9, 2024 by submitting a CARD.

42. Over several months, CRANE continued escalating data reporting concerns he identified into CRs submitted to department leads.

43. CRANE submitted over a dozen CRs from August through December 2024.

44. These CRs reflected CRANE'S assessments of non-alignment of Schedule Adherence reporting metrics with nuclear industry standards, non-

alignment of Scope Stability reporting metrics with nuclear industry standards and instances of exceeded station radiation dose goals.

45. In or about early September 2024, CRANE asked an INPO employee to review a Fermi 2 engineering memo so the INPO employee could advise whether DTE's data reporting was compliant with nuclear industry standards.

46. The INPO employee confirmed that the engineering memo reflected data that DTE was meant to – but did not – provide to INPO under the Fermi 2 quality assurance program and applicable NRC regulations, INPO standards, DTE standards, Nuclear industry standards, and Ethical reporting standards.

47. In other words, the INPO employee confirmed that O&WM's reporting to INPO was non-compliant with those applicable standards because it did not reflect the reality described in the engineering memo.

48. Thereafter, DTE learned that INPO employees had seen a copy of the engineering memo.

49. In or about September through October 2024, DTE directors questioned employees, including CRANE, about their contact with INPO, trying to determine who had disclosed the engineering memo to INPO.

50. Shortly after having been asked about his contact with INPO, CRANE attended a meeting with his direct supervisor and EARLEY.

51. In that meeting, CRANE explained that the INPO employee had

confirmed CRANE's assessment that O&WM was out of compliance with the Fermi 2 quality assurance program and applicable standards.

52. EARLEY became visibly angry upon hearing CRANE's explanation.

53. EARLEY directed CRANE to refrain from contacting INPO without EARLEY's permission.

54. CRANE refused, stating that he would remain in contact with INPO in compliance with Appendix B.

55. O&WM ultimately updated certain prior submissions to INPO which CRANE had flagged in his CARDs.

56. In the late Fall of 2024, the Plant Manager and Operations Director at Fermi approached CRANE.

57. They told CRANE that they planned to reassign him to a position reporting directly to EARLEY.

58. CRANE advised the Plant Manager that he would not be able to report to Earley given his clear and expressed anger over CRANE holding him accountable through his NOS role.

59. Nonetheless, on or about January 8, 2025, less than one year into his 2-year NOS assignment, DTE advised CRANE that he was being assigned as Manager, Online Work Management, reporting directly to EARLEY.

60. CRANE was immediately concerned that he was being set up for

termination, in retaliation for his identifying O&WM's reporting noncompliance.

61. CRANE believed that, under EARLEY's supervision, he would be forced to interact with INPO in a deceptive manner.

62. CRANE believed that, under EARLEY'S supervision, his work would be subject to unfair scrutiny and that he would be made complicit in data reporting practices inconsistent with the Fermi 2 quality assurance program and applicable NRC regulations, INPO standards, DTE standards, nuclear industry standards, and ethical reporting standards.

63. CRANE believed that DTE was deliberately transferring him in order to curtail his reporting activities and suppress his concerns.

69. CRANE advised DTE that if he was forced to report to EARLEY, he would retire from DTE.

64. DTE knew that transferring CRANE to EARLEY's supervision would cause CRANE to retire from DTE.

65. DTE told CRANE that his options were either to accept the reassignment to EARLEY'S supervision or be terminated.

66. DTE purposely transferred CRANE, making no assurance that EARLEY would not be allowed to retaliate against him for his reporting activities.

67. DTE intended to cause CRANE to retire from DTE.

68. In January 2025, CRANE had partly completed his thirtieth year of

service with DTE.

69. In planning for his eventual retirement, CRANE had previously assumed that he would remain employed by DTE longer than thirty years.

70. CRANE determined to work in the new assignment for approximately 60 days, so he could reach his thirty-year mark and then retire.

71. On January 21, 2025, CRANE was reassigned to his new role as Manager, Online Work Management, reporting directly to EARLEY.

72. Simultaneously, CRANE advised DTE of his intention to retire on April 18, 2025 and his intention to use earned PTO from March 26, 2025 until April 18, 2025, with March 25, 2025 being his last date on site at Fermi 2.

73. CRANE advised DTE that he was being forced to retire due to "gaps in trust, respect, and other DTE core values" during the preceding months.

74. CRANE referenced DTE's reactions to CRANE's verbal reports, CARDs, and outreach to INPO about O&WM's untruthful and non-compliant reporting of maintenance data.

75. Fermi 2 is subject to periodic on-site/in-person audits by INPO inspectors under certain INPO/nuclear industry standards.

76. One such audit was scheduled to begin on or about March 24, 2025.

77. In late February 2025, CRANE obtained secondhand information suggesting DTE's Site Vice President for Fermi 2 may have instructed staff to

mislead INPO inspectors at the site audit.

78. DTE's Site Vice President encouraged Fermi 2 staff to be seen correcting modest maintenance issues in the presence of INPO inspectors.

79. DTE's Site Vice President encouraged Fermi 2 staff to fabricate maintenance issues to be "corrected" during the INPO audit.

80. CRANE understood that this encouragement could be interpreted as an instruction to leave existing maintenance issues unattended temporarily so they could be fixed performatively in the presence of INPO inspectors.

81. CRANE confronted the Site Vice President with this concern via email.

82. In early Spring of 2025, CRANE told EARLEY and other DTE staff that he intended to meet with INPO inspectors when they were on site on March 24, 2025.

83. Shortly after, on or about March 20, 2025, EARLEY contacted DTE's Human Resources department about CRANE.

84. EARLEY claimed to DTE Human Resources personnel to have overheard CRANE use explicit language when criticizing the Site Vice President to a coworker.

85. EARLEY indicated that he believed CRANE was "distressed" about retirement.

86. EARLEY demanded that CRANE be required to undergo a “fitness for duty” interview with the Fermi 2 Nuclear Security division.

87. EARLEY’s report about CRANE’s “distress” was a ruse to preoccupy CRANE while the INPO visit occurred.

88. Nuclear Security informed EARLEY that his report did not raise a “fitness for duty” issue.

89. EARLEY nonetheless insisted the fitness for duty interview take place.

90. Nuclear Security conducted the fitness for duty interview with CRANE on March 20, 2025.

91. Nuclear Security determined CRANE was trustworthy and reliable.

92. Nuclear Security cleared CRANE to return to work on March 20, 2025.

93. Immediately after the fitness for duty interview, on March 20, 2025, CRANE filed an ethics complaint against EARLEY for initiating the unwarranted “fitness for duty” examination.

94. CRANE’s ethics complaint alleged that EARLEY had abused the fitness for duty process.

95. CRANE returned to work at Fermi 2 that same day, March 20, 2025, immediately after his interview and ethics complaint.

96. EARLEY saw CRANE at Fermi 2 that afternoon.

97. EARLEY was visibly surprised to see CRANE.

98. Shortly thereafter, about 2:00 p.m. on March 20, 2025, DTE summoned CRANE to meet with Human Resources, away from the Fermi 2 worksite.

99. DTE's Human Resources representative placed Crane on an administrative leave of absence without further explanation.

100. On March 20, 2025, DTE barred CRANE from entering their facilities.

101. On March 20, 2025, DTE barred CRANE from accessing all his DTE electronic accounts.

102. Being barred from DTE facilities directly prevented CRANE from communicating with INPO inspectors during their March 24, 2025 on-site/in-person audit of Fermi 2.

103. DTE kept CRANE on administrative leave through his scheduled retirement date of April 18, 2025.

## COUNT I
## WRONGFUL DISCHARGE IN VIOLATION OF THE ERA

104. Plaintiff, by reference, incorporates all preceding paragraphs as though fully set forth herein.

105. As an NRC licensee, DTE is an employer subject to Section 211 of

the ERA ("Section 211"), 42 U.S.C. § 5851.

106. Section 211 prohibits adverse employment action against an employee based on his protected activity in furtherance of the purposes of nuclear energy safety statutes, including the ERA and the Atomic Energy Act of 1954 (AEA), 42 U.S.C. § 2011 *et seq*.

107. DTE was CRANE's "employer" within the meaning of the ERA antidiscrimination provisions, 42 U.S.C. § 5851(a).

113. CRANE was DTE's "employee" within the meaning of the ERA antidiscrimination provisions, 42 U.S.C. § 5851(a).

108. Administration of the Fermi 2 quality assurance program, including through verbal reports, emailed reports, and CARDs concerning non-compliant data reporting, constitutes action to carry out the purposes of nuclear energy safety statutes within the meaning of Section 211, 42 U.S.C. § 5851(a)(1)(F).

109. CRANE's reports and escalation of data reporting non-compliance arising under the Fermi 2 quality assurance program were protected under Section 211.

110. DTE knew that CRANE had engaged in protected activity.

111. DTE, through its agents, took adverse employment action against CRANE because of his protected activity under Section 211 by:

a. Directing CRANE to refrain from direct and honest communications with INPO;

b. Surveilling CRANE's contact(s) with INPO;

c. Involuntarily reassigning CRANE as Manager, Online Work Management under EARLEY's supervision in order to suppress his reporting and to require him to be complicit in EARLEY's non-compliant reporting;

d. Constructively discharging CRANE by knowingly and intentionally causing CRANE to retire early;

e. Subjecting CRANE to an unwarranted "fitness for duty" examination to cause him to be removed from the site to suppress his communications with INPO;

f. Placing CRANE on administrative leave to suppress his communications with INPO;

g. Barring CRANE from entering DTE facilities to suppress his communications with INPO;

h. Barring CRANE from accessing all his DTE electronic accounts to suppress his communications with INPO;

i. Preventing CRANE from communicating with INPO inspectors during their March 2025 on-site/in-person audit of Fermi 2; and

j. Other adverse actions yet to be discovered.

112. The foregoing adverse employment actions against CRANE because of his protected activity violated Section 211 of the ERA.

113. As a direct and proximate result of DTE's violation of Section 211 of the ERA, CRANE has suffered and will in the future suffer damages including, but not limited to:

a. Loss of wages and earning potential;

b. Loss of employee benefits;

c. Loss of promotional opportunities;

d. Loss of professional esteem and consequent damage to CRANE's professional career;

e. Embarrassment, humiliation, inconvenience, mental anguish, indignity, outrage and disappointment; and

f. Other damages to be determined.

## COUNT II
## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

114. Plaintiff, by reference, incorporates all preceding paragraphs as though fully set forth herein.

115. During his employment with DTE, CRANE objected to and refused to acquiesce in data reporting practices inconsistent with the Fermi 2 quality assurance program and applicable NRC regulations, INPO standards, DTE standards, nuclear industry standards, and ethical reporting standards.

116. Through these actions, CRANE refused to violate the Fermi 2 quality assurance program, established pursuant to Appendix B to effectuate the purposes of nuclear energy safety statutes.

117. DTE, through its agents, took adverse employment action against CRANE based on his refusal to violate the Fermi 2 quality assurance program, Appendix B, and nuclear energy safety statutes by:

a. Directing CRANE to refrain from direct and honest communications with INPO;

b. Surveilling CRANE's contact(s) with INPO;

c. Involuntarily reassigning CRANE as Manager, Online Work Management under EARLEY's supervision in order to suppress his reporting and to require him to be complicit in EARLEY's non-compliant reporting;

d. Constructively discharging CRANE by knowingly and intentionally causing CRANE to retire early;

e. Subjecting CRANE to an unwarranted "fitness for duty" examination to cause him to be removed from the site to suppress his communications with INPO;

f. Placing CRANE on administrative leave to suppress his communications with INPO;

g. Barring CRANE from entering DTE facilities to suppress his communications with INPO;

h. Barring CRANE from accessing all his DTE electronic accounts to suppress his communications with INPO;

i. Preventing CRANE from communicating with INPO inspectors during their March 2025 on-site/in-person audit of Fermi 2; and

j. Other adverse actions yet to be discovered.

118. The above adverse action violates the clearly established public policy of the State of Michigan prohibiting adverse employment action based on an employee's internal disclosure of a violation of law or refusal to violate the law.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff respectfully requests that this Honorable Court:

A. Declare that the aforementioned practices and actions of Defendant constitute unlawful practices in violation of the cited laws;

B. Enter judgment in favor of Plaintiff and against Defendant;

C. Award all economic damages based on Plaintiff's lost wages and fringe benefits, both past and future;

D. Award all non-economic damages for injuries such as emotional distress, pain and suffering, harm to reputation, and other consequential injuries;

E. Award Plaintiff exemplary damages as allowed;

F. Award Plaintiff his attorney fees and costs; and

G. Such other relief as may be deemed appropriate at the time of final judgment.

Respectfully submitted,

McKNIGHT, CANZANO, SMITH,
RADTKE & BRAULT, P.C.

By: *<u>/s/ Darcie R. Brault</u>*

Darcie R. Brault (P43864)
Attorneys for Plaintiff
3950 W. 11 Mile Road
Berkley, MI 48072
(248) 354-9650
dbrault@michworkerlaw.com

Dated: September 15, 2026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PHILIP CRANE

Plaintiff,

-vs-

DTE ELECTRIC COMPANY

Defendant.

Case No.

Hon.

---

Darcie R. Brault (P43864)
James D. Brokaw (P88547)
McKNIGHT, CANZANO, SMITH,
BRAULT & KING, P.C.
3950 W. Eleven Mile Rd.
Berkley, MI 48072
(248) 354-9650
dbrault@michworkerlaw.com
jbrokaw@michworkerlaw.com
*Attorneys for Plaintiff*

---

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

McKNIGHT, CANZANO, SMITH,
BRAULT & KING, P.C.

By: */s/ Darcie R. Brault*
Darcie R. Brault (P43864)

Dated: September 15, 2026